## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____

TILCON, INC. and P.J. KEATING COMPANY,

          **Plaintiffs**

          **v.**

THE TOWN OF ACUSHNET; THE BOARD
OF SELECTMEN OF THE TOWN OF
ACUSHNET; THE SOIL CONSERVATION
BOARD OF THE TOWN OF ACUSHNET;
KEVIN A. GASPAR, SR. in his official capacities
as a member of the Board of Selectmen of the
Town of Acushnet and a member of the Soil
Conservation Board of the Town of Acushnet;
ROBERT HINCKLEY in his official capacities as a
member of the Board of Selectmen of the Town of
Acushnet and a member of the Soil Conservation
Board of the Town of Acushnet; and DAVID
WOJNAR in his official capacities as a member of
the Board of Selectmen of the Town of Acushnet
and a member of the Soil Conservation Board
of the Town of Acushnet,

          **Defendants.**
_____

**Civil Action No.**

## COMPLAINT

For their Complaint against defendants the Town of Acushnet, the Board of Selectmen of

the Town of Acushnet, the Soil Conservation Board of the Town of Acushnet, Kevin A. Gaspar,

Sr. (in his official capacities as a member of the Board of Selectmen of the Town of Acushnet

and a member of the Soil Conservation Board of the Town of Acushnet), Robert Hinckley (in his

official capacities as a member of the Board of Selectmen of the Town of Acushnet and a

member of the Soil Conservation Board of the Town of Acushnet), and David Wojnar (in his

official capacities as a member of the Board of Selectmen of the Town of Acushnet and a

member of the Soil Conservation Board of the Town of Acushnet) (collectively, "Defendants"), Plaintiffs Tilcon, Inc. ("Tilcon") and P.J. Keating Company ("PJK") (together, "Plaintiffs") allege as follows:

## PARTIES

1.      Tilcon is a foreign corporation that is duly organized under the laws of the state of Delaware and registered to conduct business in the Commonwealth of Massachusetts, with its principal place of business located at 642 Black Rock Avenue, New Britain, CT 06052.

2.      PJK is a foreign corporation that is duly organized under the laws of the state of Delaware and registered to conduct business in the Commonwealth of Massachusetts, with its principal place of business located at 998 Reservoir Road, Lunenburg, Worcester County, Massachusetts 01462.

3.      Tilcon is the owner of the real property located at 72 South Main Street in Acushnet, Bristol County, Massachusetts (the "Property").

4.      PJK has the right to, *inter alia*, (a) extract materials from the quarry that is located on the Property (the "Quarry"), (b) sell the materials that it extracts from the Quarry, (c) operate the Quarry, (d) operate the Hot Mix Asphalt ("HMA") plant that is located on the Property, and (e) sell asphalt that is produced at the HMA plant.

5.      Defendant the Town of Acushnet (the "Town") is a municipal corporation that is duly organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 122 Main Street, Acushnet, Bristol County, Massachusetts, 02743.

6.      Defendant the Board of Selectmen of the Town of Acushnet (the "Board of Selectmen") is a municipal body that is duly authorized under the laws of the Commonwealth of

Massachusetts, with its offices located at 122 Main Street, Acushnet, Bristol County, Massachusetts, 02743.

7.     Defendant the Soil Conservation Board of the Town of Acushnet (the "Soil Conservation Board") is a municipal body that is duly authorized under the laws of the Commonwealth of Massachusetts, with its offices located at the Parting Ways Building, 130 Main Street, Acushnet, Bristol County, Massachusetts, 02743.

8.     Defendant Robert Hinckley (in his official capacities as a member of the Board of Selectmen and a member of the Soil Conservation Board) is currently serving as a duly-elected member of the Board of Selectmen and member of the Soil Conservation Board.

9.     Defendant David Wojnar (in his official capacities as a member of the Board of Selectmen and a member of the Soil Conservation Board) ("Wojnar") is currently serving as a duly-elected member of the Board of Selectmen and member of the Soil Conservation Board.

10.     Defendant Kevin A. Gaspar, Sr. (in his official capacities as a member of the Board of Selectmen and a member of the Soil Conservation Board) ("Gaspar") is currently serving as a duly-elected member of the Board of Selectmen and member of the Soil Conservation Board.

## JURISDICTION

11.     This Court has jurisdiction over this case pursuant to (a) 28 U.S.C § 1331 because this action presents an actual and existing case and/or controversy arising under the laws of the United States and the United States Constitution and (b) 28 U.S.C § 1367 because Plaintiffs' claims under Article X of the Declaration of Rights to the Massachusetts Constitution are so related to Plaintiffs' federal claims in this action that they form part of the same case and/or controversy under Article III of the United States Constitution.

12.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(1) and/or 28 U.S.C. § 1391(b)(2) because the Commonwealth of Massachusetts is the judicial district where all Defendants reside, where a substantial part of the events or omissions giving rise to the claims asserted herein occurred, and where the Property that is the subject of this action is situated.

13.     This matter is ripe for judicial review because Plaintiffs' property has been taken without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article X of the Declaration of Rights to the Massachusetts Constitution.

## FACTUAL BACKGROUND

14.     The Property consists of approximately 381.3 acres.

15.     The Property is located in the "Industrial" zoning district under the Town's Zoning Bylaw, specifically, in the I-1 Industrial District.  Pursuant to Section 3.3.5(A)(3)-(5) of the Town's Zoning Bylaw, the following uses are permitted as of right:  mining and quarry operations, rock crushing, and hot mix asphalt operations.

16.     Mining, rock crushing, and quarry operations have been continuous on the Property since before 1919, and perhaps as early as the 1890s.  HMA operations have been in continuous operation on the Property since the 1950s.

17.     Tilcon acquired the Property on or about December 28, 2000 for the purpose of continuing the existing mining, Quarry, rock crushing, and HMA plant operations thereon.

18.     Since Tilcon acquired the Property, PJK has continued the mining, Quarry, rock crushing, and HMA plant operations at the Property.

19.     Tilcon acquired the Property for millions of dollars.  Since Tilcon acquired the Property, PJK has invested millions of additional dollars to upgrade the HMA plant and ensure that

it, the Quarry, and other operations on the Property are in full compliance with all applicable legal requirements and environmental regulations.

20.     Plaintiffs' investments in the Property were based upon the understanding, reasonable expectation, and reliance that the existing mining, Quarry, rock crushing, and HMA plant operations could continue for many decades to come due to the presence of millions of tons of material reserves (*e.g.*, rock) remaining on the Property, which have a value of millions of dollars.

21.     The HMA plant has historically used materials (*e.g.*, rock) mined from the Quarry and crushed on site for production and sale of asphalt.

22.     Plaintiffs invested in the Property based upon the understanding, reasonable expectation, and reliance that materials from the Quarry would continue to be sold, used in construction projects, and used in operating the HMA plant.

23.     PJK has historically employed more than forty (40) full-time employees for the Quarry and HMA operations at the Property.

24.     The Town's Soil Conservation Bylaw (Article VI of the Town's General Bylaws) (the "1989 Bylaw") was originally adopted by the Town on or about September 11, 1989.  The 1989 Bylaw authorizes the Board of Selectmen to hear and act upon applications for earth removal permits.  A true, genuine, and accurate copy of the 1989 Bylaw as originally enacted is attached hereto as Exhibit 1.  The 1989 Bylaw was amended on or about May 10, 2021 (the "2021 Amended Bylaw") and the Massachusetts Attorney General's Office approved the 2021 Amended Bylaw on or about August 9, 2021.  A true, genuine, and accurate copy of the 2021 Amended Bylaw is attached hereto as Exhibit 2.

25.     Section 1 of the 1989 Bylaw establishes the Soil Conservation Board.

26.     In 2017, PJK, as the operator of businesses and operations at the Property, applied to the Town for a building permit to relocate three (3) liquid-asphalt storage tanks and the HMA plant from one location on the Property to another location on the Property, to allow the existing mining, Quarry, rock crushing, and HMA plant operations to continue.

27.     On or about June 6, 2018, representatives of PJK (as the operator of businesses and operations at the Property) met with various Town officials and board members to discuss, *inter alia*, the proposed relocation of the storage tanks and HMA plant.  During that meeting, Roger A. Cabral ("Cabral"), who at that time was the Chair of the Board of Selectmen (which ultimately issued permits under the 1989 Bylaw and which now sits as the Soil Conservation Board under the 2021 Amended Bylaw), stated the following to the PJK representatives:  "Quite frankly, the Town has outgrown the quarry and believes that it is time to close the quarry so that the Property can be used for another purpose."

28.     During a meeting of representatives of PJK (as the operator of businesses and operations at the Property), members of various boards of the Town, and Town officials, held on or about July 30, 2019, the Town acknowledged that the proposed relocation of the storage tanks and HMA plant was legal and that the Town could not prevent it.  Also during that meeting, Joseph Correia, who at that time was the Acushnet Health Agent and a member of the Soil Conservation Board, warned PJK's representatives that because the Town could not prevent the relocation of the storage tanks and HMA plant, PJK should expect its operations to be closely monitored under a new inspection protocol for the Property, and that an Assistant Health Agent would be hired to monitor PJK's operations.

29.     As it had done in prior years, on or about December 12, 2019, PJK (as the operator of businesses and operations at the Property) filed an application for an earth removal

permit with the Soil Conservation Board, pursuant to Section 3(B) of the 1989 Bylaw, for the

continued operation of the Quarry on the Property (the "2019 Application").  *See*

https://www.youtube.com/watch?v=rih18Rergog (Dec. 11, 2019).

30.     In the 2019 Application, PJK (as the operator of businesses and operations at the

Property) proposed a $1 million bond for the proposed removal of an estimated 800,000 cubic

yards of material.

31.     PJK (as the operator of businesses and operations at the Property) submitted a

Decommissioning Plan in connection with its 2019 Application.  The Decommissioning Plan

was revised during the hearing process to reflect feedback from the Board of Selectmen and

Town officials, and a final version revised through April 23, 2020 was submitted to the Soil

Conservation Board.

32.     PJK (as the operator of businesses and operations at the Property) also submitted

to the Soil Conservation Board as part of the 2019 Application a six-page Particulate Matter

(PM) Control Plan for its operations at the Property, the final version of which is dated April 30,

2020 and which "outlines steps that P.J. Keating (Keating) will follow in order to control

particulate matter (PM) emissions at their facility in Acushnet, MA."

33.     At its meeting on or about June 23, 2020, the Board of Selectmen voted to grant

the 2019 Application, subject to onerous conditions that were not included in permits previously

issued by the Town.  Acushnet Cable, *Acushnet:  Board of Selectmen June 23rd 2020*, You Tube

(June 23, 2020), https://youtu.be/eZJTd5KHwTw?t=87.

34.     On or about June 26, 2020 – more than six months after the 2019 Application had

been timely filed – the Board of Selectmen issued a written conditional approval (the "Decision"),

signed by Cabral, of the 2019 Application.

35.     The Decision, which granted an earth removal permit for operations on the Property, consisted of only seven (7) findings, including the fourth finding that "[t]he Board [of Selectmen] finds that such earth removal from the Property (subject to the conditions imposed by this Permit) will not be contrary to the best interests of the Town."  A true, genuine, and accurate copy of the Decision is attached hereto as Exhibit 3.

36.     The Decision does not mention or reference any vote or recommendation of the Soil Conservation Board with respect to the 2019 Application.

37.     The Decision did not include a finding, and did not mention or reference any evidence in the record that would support a finding, that the proposed earth removal operations at the Property would be contrary to the best interests of the Town (or negatively impact neighboring residences or properties) due to noise, dust, traffic, environmental impacts, impacts to roadways, and/or for any other reason.

38.     The Decision imposed onerous conditions that were arbitrary, capricious, unduly burdensome, and unrelated to the interests protected by the 1989 Bylaw and that were not included in permits previously issued by the Town pursuant to the 1989 Bylaw.

39.     Through the Decision, the Board of Selectmen required that PJK (as the operator of businesses and operations at the Property), *inter alia*, "provide the Town with labor and materials to complete 3 miles of road repairs on an annual basis" and restricted the hours of operation at the Property "to 7AM to 9PM, Sunday through Saturday."  *See* Exhibit 3.

40.     PJK (as the operator of businesses and operations at the Property) appealed the Decision to the Massachusetts Superior Court, Bristol County Civil Action No. 2073-CV-00561.

41.     On or about July 1, 2020, the Town hired Patrick J. Hannon ("Hannon") as the Town's Assistant Health Agent.  Upon information and belief, Hannon works approximately

nineteen (19) hours per week in that role, and his sole responsibility is to monitor PJK's operations (as the operator of businesses and operations at the Property).

42. During the Soil Conservation Board's meeting on or about August 13, 2020, the Soil Conservation Board appointed Hannon to act as its inspector and/or enforcement officer. *See* https://www.youtube.com/watch?v=D6sLuBhc2WI.

43. Upon information and belief, Hannon has stated that the Town hired him "to make PJK's life a living hell."

44. On or about August 10, 2020, PJK (as the operator of businesses and operations at the Property) received a five-page Cease and Desist Notice signed by Hannon on behalf of the Town's Board of Health (the "Board of Health"), alleging numerous violations, including violations of the terms of the June 26, 2020 earth removal permit set forth in the Decision, and requiring twenty (20) actions by PJK. On or about April 8, 2022, the Superior Court adopted the Report of the Special Master submitted in Bristol County Civil Action No. 2073-CV-00561 and ruled that the Town was enjoined from enforcing the August 10, 2020 Cease and Desist Order, based, in part, on the ruling that the Board of Health's refusal to grant PJK (as the operator of businesses and operations at the Property) a hearing on its challenge to the August 10, 2020 Case and Desist Order "constituted a deprivation of Keating's procedural due process" rights.

45. On or about August 12, 2020 (before the Soil Conservation Board had appointed Hannon as its inspector and/or enforcement officer), PJK (as the operator of businesses and operations at the Property) received a five-page Cease and Desist Notice from the Soil Conservation Board, signed by Hannon, alleging numerous violations of the terms of the June 26, 2020 earth removal permit set forth in the Decision. On or about April 8, 2022, the Superior Court adopted the Report of the Special Master submitted in Bristol County Civil Action No. 2073-CV-

00561 and ruled that (a) Hannon lacked authority under the 1989 Bylaw to issue or enforce the

August 12, 2020 Cease and Desist Order; (b) the August 12, 2020 Cease and Desist Order was null

and void; and (c) the Town was enjoined from enforcing the August 12, 2020 Cease and Desist

Order.

46.     On or about August 13, 2020, PJK (as the operator of businesses and operations at

the Property) received a Notice of Violation dated August 3, 2020 (again, before the Soil

Conservation Board had appointed Hannon) from the Soil Conservation Board, signed by

Hannon.

47.     Also on or about August 13, 2020, PJK (as the operator of businesses and

operations at the Property) received a Notice of Violation dated August 5, 2020 from the Board

of Health, signed by Hannon.

48.     Although PJK (as the operator of businesses and operations at the Property)

requested hearings before the Board of Health and the Soil Conservation Board following issuance

of the August 2020 Cease and Desist Orders and Notices of Violation, PJK was never granted an

opportunity to be heard before either Board with respect to those Orders and/or Notices.

49.     On or about November 19, 2020, Hannon sent an e-mail to PJK (as the operator of

businesses and operations at the Property) regarding the expiration of the June 26, 2020 earth

removal permit and directing that a "permit renewal application and required submittals must be

submitted as soon as possible in order for the town to process and approve the renewal of the

permit before it expires."  A true, genuine, and accurate copy of that e-mail is attached hereto as

Exhibit 4.

50.     On or about December 15, 2020, counsel for the Town wrote in an e-mail to

PJK's counsel that PJK (as the operator of businesses and operations at the Property) "is not

protected from any regulation and the soil board permitting process is necessary.  We can certainly fight this out in court and the Town has other means at its disposal to regulate Keating's activities at the site if necessary."  A true, genuine, and accurate copy of that e-mail is attached hereto as Exhibit 5.

51.     On or about May 10, 2021, Defendant Gaspar, Defendant Wojnar, and David Desroches ("Desroches") – the sole members of the Board of Selectmen at that time – presented Warrant Article 22 to the Acushnet Annual Town Meeting, seeking to amend the 1989 Bylaw. *See* Acushnet Cable, *Acushnet:  Annual Town Meeting May 10th 2021*, YouTube (May 11, 2019), https://youtu.be/Xp374JB860k?t=8446.

52.     During the Acushnet Town Meeting held on or about May 10, 2021, in response to a question from a resident asking for an elaboration of the proposed amendments to the 1989 Bylaw to explain the intended effect of the proposed amendments, Defendant Wojnar stated as follows:  "So the impetus behind this, this reform, as you all know what has taken place with P.J. Keating, one we've got a redundant process, we've got a soil, um, uh, board that ultimately is advisory in nature to the Board of Selectmen, this would cut out that process.  In addition, this gives the Town additional, uh, teeth, uh, to crack down on those who are violating the bylaw or the law, allows us to impose violations, uh, fines for violations.  As you know, P.J. Keating has been an ongoing saga, and we believe that this, uh, Bylaw, redoing this Bylaw, would give us the teeth that we need to address that situation."  *See* Acushnet Cable, *Acushnet: Annual Town Meeting May 10th 2021*, YouTube (May 11, 2019), https://youtu.be/Xp374JB860k?t=8568.

53.     The 2021 Amended Bylaw was enacted on or about May 10, 2021, and the Massachusetts Attorney General's Office approved the 2021 Amended Bylaw on or about August 9, 2021.  *See* Exhibit 2.

54.     After being hired by the Town and before the 2021 Amended Bylaw had been enacted, Hannon had conducted numerous inspections of the Property and had demanded and received voluminous business records, documents, and information from PJK (as the operator of businesses and operations at the Property).

55.     Before the 2021 Amended Bylaw had been enacted, Defendant Gaspar and Desroches had visited the Property numerous times and had been privy to information regarding the operations being conducted on the Property.

56.     Consequently, before the 2021 Amended Bylaw had been enacted, the Board of Selectmen and the Soil Conservation Board's acting inspector and/or enforcement officer had in-depth, detailed information regarding the existing conditions at the Property and the mining, Quarry, rock crushing, and HMA plant operations being conducted at the Property.

57.     Before the 2021 Amended Bylaw had been enacted, section 1(A) of the 1989 Bylaw provided that "[t]he members of the [Soil Conservation] Board shall consist of one member of the Board of Selectmen, or a designee appointed by the Board of Selectmen, one member of the Planning Board, Board of Health, Conservation Commission and the Highway Superintendent, or a designee from the Highway Department, or a designee from any one of these Boards.  Each of the Boards having a representative on the Soil Conservation Board shall select its representative by a majority vote of the Board so represented at any meeting at which a quorum is present."  *See* Exhibit 1.

58.     Before the 2021 Amended Bylaw had been enacted, section 3(A) of the 1989 Bylaw charged the Soil Conservation Board with considering applications for earth removal permits, but designated the Board of Selectmen as the authority authorized to issue permits.  *See* Exhibit 1.

59.     Before the 2021 Amended Bylaw had been enacted, section 1(C)(2) of the 1989 Bylaw provided that an "affirmative vote of at least three (3) members [of the Soil Conservation Board] shall be required for the recommendation [to the Board of Selectmen] to grant, modify, revoke or remove any permit authorized hereunder."  *See* Exhibit 1.

60.     Section 1(A) of the 2021 Amended Bylaw provides that "[t]he members of the [Soil Conservation] Board shall consist of the Board of Selectmen."  *See* Exhibit 2.  Thus, Defendant Gaspar, Defendant Wojnar, and Desroches effected an amendment to the 1989 Bylaw to make themselves (as the then-members of the Board of Selectmen) the sole members of the Soil Conservation Board and solely responsible for issuing permits and administering the 2021 Amended Bylaw.

61.     Before the 2021 Amended Bylaw had been enacted, section 1(C)(6) of the 1989 Bylaw empowered the Soil Conservation Board to appoint an "inspector."  *See* Exhibit 1. Section 1(C)(6) of the 2021 Amended Bylaw empowers the Soil Conservation Board to appoint an "enforcement officer."  *See* Exhibit 2.

62.     Before the 2021 Amended Bylaw had been enacted, section 4(C) of the 1989 Bylaw provided that "[e]arth removal activities in lawful operation on any parcel of land at the time this By-law is adopted may continue unless and until abandoned for more than twelve (12) consecutive months."  *See* Exhibit 1.  This protection was removed from the 2021 Amended Bylaw (*see* Exhibit 2), as counsel for the Town acknowledged in a December 16, 2021 letter

stating that "[t]he amended Soil Conservation Bylaw repealed the Section 4(C) exception without including a provision to allow for continued grandfather status" and that "PJK is not grandfathered under the prior version of the Soil Conservation Bylaw and its now-repealed Section 4(C) exception." A true, genuine, and accurate copy of the December 16, 2021 letter from counsel for the Town is attached hereto as Exhibit 6.

63. Before the 2021 Amended Bylaw had been enacted, section 2 of the 1989 Bylaw set forth five (5) defined terms applicable to the 1989 Bylaw's provisions. *See* Exhibit 1. This section was significantly expanded in the 2021 Amended Bylaw to add numerous defined terms and broaden the definitions of previously defined terms, in ways that severely impact the operations at the Property. *See* Exhibit 2. For example, section 2 of the 2021 Amended Bylaw:

- expanded the definition of the term "earth" to include "bedrock";

- added the term "Large Operations," which is defined to encompass properties of greater than 50 acres or soil removal operations greater than 15,000 cubic yards per year;

- added the term "Soil Removal," which is defined to include "the use of any equipment for any activity where soil is being moved or uncovered and shall include . . . adding to or removing from open storage piles"; and

- added the term "Open Storage Pile," which is defined as any accumulation of material that is more than three feet tall with a surface area of 150 square feet.

64. Before the 2021 Amended Bylaw had been enacted, section 3(A) of the 1989 Bylaw provided that no earth removal permit shall be issued unless the Board of Selectmen "finds that such removal (subject to the conditions imposed by the permit) shall not be contrary to the best interests of the Town," and that "removal of earth material shall be considered contrary to the best interest of the Town which (1) will be injurious or dangerous to the public health and safety, (2) will produce noise, dust, or other effects observable at the lot lines in

amounts seriously objectionable or detrimental to the normal use of adjacent property, (3) will

result in transportation of materials on ways giving access to the land in question which will

cause traffic congestion or hazards, (4) will result in transportation which will cause undue injury

to the roadway surfaces, (5) will result in change in topography and cover which will be

disadvantageous to the most appropriate use of land on which the operation is conducted, or

(6) will have a material adverse effect on the health or safety of persons living in the

neighborhood, or on the use of amenities of adjacent land." *See* Exhibit 1.

65.     The 2021 Amended Bylaw imposes additional requirements and limitations for

the issuance of an earth removal permit, which the Quarry operations at the Property cannot

satisfy and which therefore adversely impact Plaintiffs.

66.     As just one example of the 2021 Amended Bylaw imposing additional

requirements and limitations for the issuance of an earth removal permit, before the 2021

Amended Bylaw had been enacted, section 3(B)(8)(k) of the 1989 Bylaw required that "[a]t the

conclusion of every day's operation, the vertical bank shall be caved in to a slope to protect

public safety." *See* Exhibit 1.  In contrast, section 3(B)(8)(k) of the 2021 Amended Bylaw

requires that "[i]n approving the issuance of a permit, the Board shall impose reasonable

conditions, especially designed to safeguard the neighborhood and the town, as follows: . . .

(k).  At the conclusion of every day's operation, the vertical bank shall be caved into a slope no

greater than a 2 to 1 vertical slope to protect public safety." *See* Exhibit 2.  At the time the 2021

Amended Bylaw was enacted, Defendants were aware that the Quarry's bedrock walls cannot

satisfy a 2-to-1 vertical slope requirement.  The purported reason for the 2-to-1 vertical slope

requirement, protection of public safety, is inapplicable because the Property is zoned

15

"industrial," the "neighborhood" is not defined, and the stability of bedrock walls renders them safe without such a requirement.

67.     On or about August 11, 2021, Hannon delivered a copy of the 2021 Amended Bylaw to Michael Warner ("Warner"), an employee of PJK (as the operator of businesses and operations at the Property) and the Manager of the Quarry, and advised Warner to read it immediately.

68.     Also on or about August 11, 2021, Hannon sent an e-mail to Warner, threatening administrative enforcement against PJK (as the operator of businesses and operations at the Property) if it did not file an application for a permit under the 2021 Amended Bylaw within four business days, by August 17, 2021.  A true, genuine, and accurate copy of that e-mail is attached hereto as Exhibit 7.

69.     Hannon copied Desrosches on his August 11, 2021 e-mail to Warner.

70.     On or about September 22, 2021, Robert Medeiros, who at that time was a member of the Soil Conservation Board and who currently is a member of the Board of Health, confirmed that officials and board members of the Town intended to put the operations at the Property out of business when he told a PJK employee that she would not have a job for much longer.

71.     On or about December 29, 2021, Hannon sent a letter to PJK (as the operator of businesses and operations at the Property) stating that PJK must "comply with the [2021 Amended] Bylaw which required, among other things . . . an application for a permit to remove soil from the" Property and threatening that failure to apply by December 31, 2021 would result in his "issu[ing] a cease and desist order stopping any earth removal activities until Keating applies for and holds a valid permit."  A true, genuine, and accurate copy of the December 29,

2021 letter from Hannon is attached hereto as Exhibit 8.  At that time, the Town had not issued

an application form for permit applications.

72.     On or about April 19, 2022 – after PJK (as the operator of businesses and

operations at the Property) informed the Soil Conservation Board that the Soil Conservation

Board had not issued an application form for permit applications – Hannon drafted an application

form and sent the application form to PJK.  *See*

https://www.youtube.com/watch?v=YskXaEie2_4.

73.     During the Soil Conservation Board meeting held on or about April 20, 2022,

Desroches admitted that the Soil Conservation Board had not established a fee schedule for

applications and would set the application fee after receiving a completed application.  *See*

https://www.youtube.com/watch?v=YskXaEie2_4.

74.     During the Soil Conservation Board meeting held on or about April 20, 2022,

Hannon stated that the 2021 Amended Bylaw expressly authorizes the Soil Conservation Board

to ask PJK (as the operator of businesses and operations at the Property) for anything the Soil

Conservation Board deems appropriate.  *See* https://www.youtube.com/watch?v=YskXaEie2_4.

75.     Through multiple Cease and Desist Orders issued in April 2022, Hannon and the

Soil Conservation Board informed PJK (as the operator of businesses and operations at the

Property) that it could not operate the HMA plant without an earth removal permit.  True,

genuine, and accurate copies of those Cease and Desist Orders are attached hereto as Exhibit 9.

*See also* https://www.youtube.com/watch?v=YskXaEie2_4.

76.     On or about May 5, 2022, Hannon, in his capacity as Soil Conservation Board

Inspector, presented to the Town's Planning Board (the "Planning Board") a petition by the

residents of the Town (the "Citizens' Petition") to change certain language in the 2021 Amended

Bylaw.  *See* Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://www.youtube.com/watch?v=YY-bzV-vJic.  The Planning Board recommended that the Citizens' Petition be granted.  *See* https://youtu.be/YY-bzV-vJic?t=7758.  Ultimately, the Town indefinitely postponed consideration of the Citizens' Petition.  *See* https://youtu.be/QZ15ize6U7U?t=10096.

77.    During the meeting held on or about May 5, 2022, Hannon stated, *inter alia*, the following:

- "The reason for this [change] was to try and get P.J. Keating to reduce the amount of disturbed area they have and limit their dust . . . .  And a lot of the changes in the 2021 bylaw are directed towards P.J. Keating."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=3299.

- "The 2021 bylaw was absolutely reactive to what was going on at P.J. Keating."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=3333.

- "Prior to changing in 2021 . . . earth removal was not the act of digging dirt out of the ground . . . .  It was actually removing it from the property.  So the town was unable really to regulate Keating's operation because it wasn't earth removal until it went out the gate.  We had no control over what they did inside the quarry because of that, the way it was set up."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=3422.

- "[W]e made a definition of large operations so that we could carve out the smaller contractors in town, carve out the people with stockpiles that aren't running something more than 50 acres."  Acushnet Cable, *Acushnet: Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=3583.

- "Our large operation in town has never wanted to give us a finished plan.  They told us that it was proprietary information, and they didn't want that information out to their competitors to know how much life this quarry has to it."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=4561.

- "[M]ost of the soil bylaw is because of . . . Keating.  A lot of this is about P.J. Keating."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*,

18

YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=7163.

- "And everyone has been afraid to say P.J. Keating because they sued us for violating their civil rights.  I have implied immunity as a public employee, so I'm here to tell you it's all about P.J. Keating."  Acushnet Cable, *Acushnet: Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=7175.

- "The selectmen are willing to be very protective of the town's small business people."  Acushnet Cable, *Acushnet: Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=7479.

78.     At the conclusion of Hannon's presentation during the meeting held on or about May 5, 2022, Bryan Deschamps ("Deschamps"), one of the members of the Planning Board, stated that "it's Keating that we're really trying to put the clamp on instead, of, you know, the small people in town."  Acushnet Cable, *Acushnet:  Planning Board May 5th 2022*, YouTube (May 6, 2022), https://youtu.be/YY-bzV-vJic?t=7515.

79.     As demonstrated by, *inter alia*, Defendants' conduct, as well as Hannon's and Deschamps' statements quoted above, Defendants have engaged in a series of deliberate, methodical, concerted, and systematic actions to specifically target Plaintiffs in such a manner as to deprive Plaintiffs of all beneficial use of their property.

80.     Defendants knew and understood that their conduct was specifically aimed at stopping the legal, longstanding operations on the Property, and for that purpose Defendants knowingly instituted standards and criteria that Plaintiffs and/or the Property could not satisfy.

81.     Even though Defendants have engaged in a series of deliberate, methodical, concerted, and systematic actions to specifically target Plaintiffs and the Property and to stop the legal, longstanding operations on the Property, and even though Defendants, by enacting the 2021 Amended Bylaw, knowingly instituted standards and criteria that Plaintiffs and/or the

Property could not satisfy, Plaintiffs nonetheless filed an application for an earth removal permit on November 7, 2022.

82.     The 2021 Amended Bylaw establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy and that therefore prevent Plaintiffs from continuing the Quarry operations on the Property.

83.     The Soil Conservation Board has taken the position that an earth removal permit is required for the HMA plant operations on the Property.  Because the 2021 Amended Bylaw establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy, the Soil Conservation Board's position that an earth removal permit must be obtained to operate the HMA plant would prevent Plaintiffs from continuing the HMA plant operations on the Property.

84.     The 2021 Amended Bylaw establishes standards, criteria, and requirements that prevent Plaintiffs from exercising their mineral rights on and underneath the subsurface of the Property.

85.     Enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property has prevented Plaintiffs from, *inter alia*, continuing the longstanding Quarry operations on the Property and has caused Plaintiffs to incur damages.

86.     Continued enforcement of the 2021 Amended Bylaw will cause Plaintiffs to incur additional damages from, *inter alia*, loss of revenue from, *inter alia*, sales of material from the Quarry and HMA plant that would otherwise be made.

87.     The 2021 Amended Bylaw constitutes a "regulation [that] goes too far" (*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)) and/or deprives Plaintiffs of all economically beneficial use of their property.

88.     The 2021 Amended Bylaw deprives Plaintiffs of, *inter alia*, all economically beneficial uses of the Quarry.  The Property is zoned for industrial use and has historically been the site of Quarry operations.  Based on due diligence before acquiring the Property, the Quarry has material reserves (*e.g.*, rock) of millions of tons, worth millions of dollars.

89.     Because all the business operations at the Property, including (without limitation) the HMA plant, are integrally tied to the Quarry operations, the 2021 Amended Bylaw so significantly affects all the business operations at the Property that the 2021 Amended Bylaw constitutes a "regulation [that] goes too far" and/or deprives Plaintiffs of all economically beneficial use of their property (including, but not limited to, the Property and all subsurface mineral rights).

90.     The 2021 Amended Bylaw interferes with, *inter alia*, Plaintiffs' reasonable investment-backed expectations for the Property.  Tilcon acquired the Property for millions of dollars and thereafter PJK invested millions of additional dollars to ensure that operations on the Property are in full compliance with all applicable legal requirements and environmental regulations, which Tilcon and PJK did with the reasonable expectation of continuing the then-existing mining, Quarry, rock crushing, and HMA plant operations.

91.     Defendants' actions in amending the 1989 Bylaw and enforcing the 2021 Amended Bylaw against Plaintiffs and the Property are not designed to mitigate any alleged public harm from Plaintiffs' private use of the Property, but instead are designed to stop the longstanding operations at the Property.

92.     At the time that Tilcon acquired the Property for millions of dollars and PJK thereafter invested millions of additional dollars to ensure that operations on the Property fully complied with all applicable legal requirements and environmental regulations, Plaintiffs could not

have reasonably anticipated that regulations would be adopted that would prevent, *inter alia*, operation of the Quarry and/or the HMA plant.

93.     Defendants' actions in amending the 1989 Bylaw and enforcing the 2021 Amended Bylaw against Plaintiffs and the Property have interfered with, and continue to interfere with, Plaintiffs' current and future use of, and operations at, the Property, have caused damage to Plaintiffs, and constitute a taking that requires just compensation to be paid to Plaintiffs.

## COUNT I

## 42 U.S.C. § 1983 FOR REGULATORY TAKING UNDER THE FIFTH AMENDMENT TO THE UNITED STATES CONSTITUTION

94.     Plaintiffs hereby restate and incorporate by reference the allegations and statements contained in the preceding paragraphs of this Complaint.

95.     An actual controversy exists between the parties as to the constitutionality of the enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property.

96.     The Takings Clause of the Fifth Amendment to the United States Constitution, made applicable to the Commonwealth of Massachusetts, inclusive of its municipalities, through the Fourteenth Amendment, provides that "private property [shall not] be taken for public use, without just compensation."

97.     The 2021 Amended Bylaw establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy and that therefore prevent Plaintiffs from continuing the Quarry operations on the Property.

98.     The Soil Conservation Board has taken the position that an earth removal permit is required for the HMA plant operations on the Property.  Because the 2021 Amended Bylaw

establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy, the Soil Conservation Board's position that an earth removal permit must be obtained to operate the HMA plant would prevent Plaintiffs from continuing the HMA plant operations on the Property.

99.     The 2021 Amended Bylaw establishes standards, criteria, and requirements that prevent Plaintiffs from exercising their mineral rights on and underneath the surface of the Property.

100.     Enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property has, *inter alia*, prevented Plaintiffs from continuing the longstanding Quarry operations on the Property, prevented and/or substantially interfered with the longstanding HMA plant operations at the Property, and caused Plaintiffs to incur damages.

101.     Continued enforcement of the 2021 Amended Bylaw will cause Plaintiffs to incur additional damages from, *inter alia*, loss of revenue from, *inter alia*, sales of material from the Quarry and HMA plant that would otherwise be made.

102.     The 2021 Amended Bylaw constitutes a "regulation [that] goes too far" and/or deprives Plaintiffs of all economically beneficial use of their property.

103.     The 2021 Amended Bylaw deprives Plaintiffs of, *inter alia*, all economically beneficial uses of the Quarry.  The Property is zoned for industrial use and has historically been the site of Quarry operations.  Based on due diligence before acquiring the Property, the Quarry has material reserves (*e.g.*, rock) of millions of tons, worth millions of dollars.

104.     Because all the business operations at the Property, including (without limitation) the HMA plant, are integrally tied to the Quarry operations, the 2021 Amended Bylaw so significantly affects all the business operations at the Property that the 2021 Amended Bylaw

constitutes a "regulation [that] goes too far" and/or deprives Plaintiffs of all economically beneficial use of their property.

105.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property significantly interferes with, *inter alia*, Plaintiffs' reasonable investment-backed expectations for the Property, inclusive of Plaintiffs' reasonable investment-backed expectations concerning the subsurface mineral rights, because the Property is zoned for industrial use, has historically been the site of Quarry operations, and has substantial bedrock reserves worth millions of dollars based on due diligence before acquiring the Property at considerable expense.

106.    Defendants' actions in enacting the 2021 Amended Bylaw and enforcing the 2021 Amended Bylaw against Plaintiffs and the Property are not designed to mitigate any alleged public harm from Plaintiffs' private use of the Property, do not serve a public purpose, and have denied Plaintiffs, *inter alia*, all economically beneficial or productive use of their property (and/or resulted in a "regulation [that] goes too far"), for which Plaintiffs are owed just compensation.

107.    At the time that Tilcon acquired the Property for millions of dollars and PJK thereafter invested millions of additional dollars to ensure that operations on the Property fully complied with all applicable legal requirements and environmental regulations, Plaintiffs could not have reasonably anticipated that regulations would be adopted that would prevent, *inter alia*, operation of the Quarry and/or the HMA plant.

108.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and all subsurface mineral rights), without due process and just compensation, in violation of the Fifth Amendment to the United States Constitution, for which Plaintiffs are entitled to damages.

109.    42 U.S.C. § 1983 prohibits the deprivation of any rights, privileges, or immunities secured by the Constitution and/or laws of the United States.

110.    As a result of the conduct described herein, Defendants have acted under color of State law to deprive Plaintiffs of rights, privileges, and/or immunities secured by the Fifth and Fourteenth Amendments to the United States Constitution.

111.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property has caused, and will continue to cause, Plaintiffs substantial, continuing, imminent, and irreparable harm in violation of Plaintiffs' constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution.  The substantial, continuing, imminent, and irreparable harm to Plaintiffs can be abated only if the 2021 Amended Bylaw is declared unconstitutional as applied to Plaintiffs and the Property and Defendants are enjoined from enforcing the 2021 Amended Bylaw against Plaintiffs and the Property.

## COUNT II

**REGULATORY TAKING UNDER ARTICLE X
OF THE MASSACHUSETTS DECLARATION OF
RIGHTS TO THE MASSACHUSETTS CONSTITUTION**

112.    Plaintiffs hereby restate and incorporate by reference the allegations and statements contained in the preceding paragraphs of this Complaint.

113.    An actual controversy exists between the parties as to the constitutionality of the enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property.

114.    Article X of the Massachusetts Declaration of Rights to the Massachusetts Constitution states in relevant part that "no part of the property of any individual can, with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body of the people. . . .  And whenever the public exigencies require that the

25

property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."

115.    The 2021 Amended Bylaw establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy and that therefore prevent Plaintiffs from continuing the Quarry operations on the Property.

116.    The Soil Conservation Board has taken the position that an earth removal permit is required for the HMA plant operations on the Property.  Because the 2021 Amended Bylaw establishes standards, criteria, and requirements that Plaintiffs and/or the Property cannot satisfy, the Soil Conservation Board's position that an earth removal permit must be obtained to operate the HMA plant would prevent Plaintiffs from continuing the HMA plant operations on the Property.

117.    The 2021 Amended Bylaw establishes standards, criteria, and requirements that prevent Plaintiffs from exercising their mineral rights on and underneath the subsurface of the Property.

118.    Enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property has prevented Plaintiffs from, *inter alia*, continuing the longstanding Quarry operations on the Property and has caused Plaintiffs to incur damages.

119.    Continued enforcement of the 2021 Amended Bylaw will cause Plaintiffs to incur additional damages from, *inter alia*, loss of revenue from, *inter alia*, sales of material from the Quarry and HMA plant that would otherwise be made.

120.    The 2021 Amended Bylaw constitutes a "regulation [that] goes too far" and/or deprives Plaintiffs of all economically beneficial use of their property.

121.    The 2021 Amended Bylaw deprives Plaintiffs of, *inter alia*, all beneficial, reasonable, practical, and practicable economic uses of the Quarry.  The Property is zoned for industrial use and has historically been the site of Quarry operations.  Based on due diligence before acquiring the Property, the Quarry has material reserves (*e.g.*, rock) of millions of tons, worth millions of dollars.

122.    Because all the business operations at the Property, including (without limitation) the HMA plant, are integrally tied to the Quarry operations, the 2021 Amended Bylaw so significantly affects all the business operations at the Property that the 2021 Amended Bylaw constitutes a "regulation [that] goes too far" and/or deprives Plaintiffs of all economically beneficial use of their property.

123.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property significantly interferes with, *inter alia*, Plaintiffs' reasonable investment-backed expectations for the Property, inclusive of Plaintiffs' reasonable investment-backed expectations concerning the subsurface mineral rights, because the Property is zoned for industrial use, has historically been the site of Quarry operations, and has substantial bedrock reserves worth millions of dollars based on due diligence before acquiring the Property at considerable expense.

124.    Defendants' actions in enacting the 2021 Amended Bylaw and enforcing the 2021 Amended Bylaw against Plaintiffs and the Property are not designed to mitigate any alleged public harm from Plaintiffs' private use of the Property, do not serve a public purpose, and have denied Plaintiffs, *inter alia*, all economically beneficial or productive use of their property (and/or resulted in a "regulation [that] goes too far"), for which Plaintiffs are owed just compensation.

125.    At the time that Tilcon acquired the Property for millions of dollars and PJK thereafter invested millions of additional dollars to ensure that operations on the Property fully complied with all applicable legal requirements and environmental regulations, Plaintiffs could not have reasonably anticipated that regulations would be adopted that would prevent, *inter alia*, operation of the Quarry and/or the HMA plant.

126.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and all subsurface mineral rights), without due process and just compensation, in violation of Article X of the Massachusetts Declaration of Rights to the Massachusetts Constitution, for which Plaintiffs are entitled to damages.

127.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property has caused, and will continue to cause, Plaintiffs substantial, continuing, imminent, and irreparable harm in violation of Plaintiffs' constitutional rights under Article X of the Massachusetts Declaration of Rights to the Massachusetts Constitution.  The substantial, continuing, imminent, and irreparable harm to Plaintiffs can be abated only if the 2021 Amended Bylaw is declared unconstitutional as applied to Plaintiffs and the Property and Defendants are enjoined from enforcing the 2021 Amended Bylaw against Plaintiffs and the Property.

<u>**COUNT III**</u>

<u>**ATTORNEYS' FEES, COSTS, AND EXPENSES PURSUANT TO 42 U.S.C. § 1988**</u>

128.    Plaintiffs hereby restate and incorporate by reference the allegations and statements contained in the preceding paragraphs of this Complaint.

129.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and

all subsurface mineral rights), without due process and just compensation, in violation of the Fifth Amendment to the United States Constitution, for which Plaintiffs are entitled to damages.

130.    42 U.S.C. § 1983 prohibits the deprivation of any rights, privileges, and/or immunities secured by the Constitution and laws of the United States.

131.    As a result of the conduct described herein, Defendants have acted under color of State law to deprive Plaintiffs of rights, privileges, and/or immunities secured by the Fifth and Fourteenth Amendments to the United States Constitution.

132.    Plaintiffs are entitled to their costs, expenses, reasonable attorneys' fees, and reasonable experts' fees and expenses, pursuant to 42 U.S.C. § 1988, based on Defendants' unlawful deprivation of Plaintiffs' rights, privileges, and/or immunities secured by the Fifth and Fourteenth Amendments to the United States Constitution.

## COUNT IV

## DECLARATORY JUDGMENT

### (Federal Claim)

133.    Plaintiffs hereby restate and incorporate by reference the allegations and statements contained in the preceding paragraphs of this Complaint.

134.    Within the meaning of 28 U.S.C. §§ 2201-02, an actual controversy has arisen between Plaintiffs and Defendants regarding the enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property, which controversy is capable of judicial resolution.

135.    Plaintiffs seek a declaratory judgment that the 2021 Amended Bylaw, as applied to Plaintiffs and/or the Property, is unconstitutional and invalid under the Fifth and Fourteenth Amendments to the United States Constitution.

136.    Plaintiffs are entitled to a declaratory judgment that the 2021 Amended Bylaw, as applied to Plaintiffs and/or the Property, is unconstitutional and invalid under the Fifth and Fourteenth Amendments to the United States Constitution because enforcement of the 2021 Amended Bylaw against Plaintiffs and/or the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and all subsurface mineral rights), without due process and just compensation.

137.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and/or the Property has caused, and will continue to cause, Plaintiffs substantial, continuing, imminent, and irreparable harm in violation of Plaintiffs' constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution.  The substantial, continuing, imminent, and irreparable harm to Plaintiffs can be abated only if the 2021 Amended Bylaw is declared unconstitutional as applied to Plaintiffs and the Property and Defendants are enjoined from enforcing the 2021 Amended Bylaw against Plaintiffs and the Property.

**COUNT V**

**DECLARATORY JUDGMENT**

**(State Claim)**

138.    Plaintiffs hereby restate and incorporate by reference the allegations and statements contained in the preceding paragraphs of this Complaint.

139.    Within the meaning of 28 U.S.C. §§ 2201-02, an actual controversy has arisen between Plaintiffs and Defendants regarding the enforcement of the 2021 Amended Bylaw against Plaintiffs and the Property, which controversy is capable of judicial resolution.

140.    Plaintiffs seek a declaratory judgment that the 2021 Amended Bylaw, as applied to Plaintiffs and/or the Property, is unconstitutional and invalid under Article X of the Declaration of Rights to the Massachusetts Constitution.

141.    Plaintiffs are entitled to a declaratory judgment that the 2021 Amended Bylaw, as applied to Plaintiffs and/or the Property, is unconstitutional and invalid under Article X of the Declaration of Rights to the Massachusetts Constitution because enforcement of the 2021 Amended Bylaw against Plaintiff and/or the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and all subsurface mineral rights), without due process and just compensation.

142.    The enforcement of the 2021 Amended Bylaw against Plaintiffs and/or the Property has caused, and will continue to cause, Plaintiffs substantial, continuing, imminent, and irreparable harm in violation of Plaintiffs' constitutional rights under Article X of the Declaration of Rights to the Massachusetts Constitution.  The substantial, continuing, imminent, and irreparable harm to Plaintiffs can be abated only if the 2021 Amended Bylaw is declared unconstitutional as applied to Plaintiffs and the Property and Defendants are enjoined from enforcing the 2021 Amended Bylaw against Plaintiffs and the Property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a)    declare that enforcement of the 2021 Amended Bylaw against Plaintiffs and/or the Property constitutes a regulatory taking of Plaintiffs' property (including, but not limited to, the Property and all subsurface mineral rights) without due process and just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, for which Plaintiffs are entitled to just compensation, damages, and injunctive relief;

b)    declare that enforcement of the 2021 Amended Bylaw against Plaintiffs and/or the Property constitutes a regulatory taking of Plaintiffs' property

(including, but not limited to, the Property and all subsurface mineral rights) without due process and just compensation, in violation of Article X of the Massachusetts Declaration of Rights to the Massachusetts Constitution, for which Plaintiffs are entitled to just compensation, damages, and injunctive relief;

c)  temporarily, preliminarily, and permanently enjoin Defendants from enforcing or implementing the 2021 Amended Bylaw against Plaintiffs and the Property;

d)  award Plaintiffs damages in excess of $50,000,000.00 or as otherwise determined at trial;

e)  award Plaintiffs their costs, expenses, reasonable attorneys' fees, and reasonable experts' fees and expenses, pursuant to 42 U.S.C. § 1988; and

f)  award Plaintiffs such other and further relief as justice so requires.

## **DEMAND FOR JURY TRIAL**

Plaintiffs Tilcon, Inc. and P.J. Keating Company demand trial by jury on all counts,

claims, and issues so triable.

Plaintiffs,

TILCON, INC. and
P.J. KEATING COMPANY

By their attorneys,

*/s/ Christopher J. Yagoobian*
Patricia K. Rocha (BBO #542348)
procha@apslaw.com
Joseph Avanzato (BBO #563143)
javanzato@apslaw.com
Christopher J. Yagoobian (BBO #697413)
cyagoobian@apslaw.com
Stephen D. Lapatin (BBO #706158)
slapatin@apslaw.com
ADLER POLLOCK & SHEEHAN P.C.
One Citizens Plaza, 8th Floor
Providence, RI  02903-1345
Tel:  401-274-7200
Dated:  December 2, 2022

*4893-2980-4347, v. 6*